DECISION AND JUDGMENT ENTRY
{¶ 1} This is an appeal from a judgment of conviction and sentence entered by the Lucas County Court of Common Pleas after a jury found defendant-appellant, David Adkins, guilty of two counts of aggravated robbery with the specifications that appellant had a firearm about his person during the commission of those offenses. From that judgment, appellant now raises the following assignments of error:
 {¶ 2} "Assignment of Error No. 1:
 {¶ 3} "The trial court erred in not granting objections to statements by state's witness Jerome Renzhohfer [sic] that he and his family were threatened by Mr. Adkins.
 {¶ 4} "Assignment of Error No. 2:
 {¶ 5} "The trial court committed error in not granting a continuance to permit return of defense witness Dennis Duhart from custody in Mississippi or to permit Mr. Duhart's testimony by deposition.
 {¶ 6} "Assignment of Error No. 3:
 {¶ 7} "The trial court committed error in imposing consecutive sentences."
 {¶ 8} On January 7, 2002, appellant, Jerome Renzhofer and George Hughes were indicted and charged with the aggravated robberies of two convenience stores on December 22 and 27, 2001. Both counts of the indictment included firearm specifications. Prior to trial, appellant filed a motion to admit the hearsay testimony of Dennis Duhart, a witness appellant had intended to call. Appellant asserted that because Duhart had recently been arrested and transported to Mississippi to face charges there, he was no longer available to testify at appellant's trial. On the first day of the trial below, the court heard arguments on the outstanding motions and denied appellant's motion to admit the hearsay testimony of Duhart. Appellant then moved for a continuance so that he could attempt to bring Duhart back from Mississippi. The court denied the motion and determined that the trial should proceed. The following evidence was then presented to the jury.
 {¶ 9} On December 22, 2001, Sharon Laraby was working at the Buckeye Carryout in Toledo, Lucas County, Ohio. Several minutes before 8:00 p.m., Laraby noticed two men standing outside of the store. One man wore a mask that looked like a baseball and the second man, whom Laraby described as African-American, did not wear a mask. Laraby also noticed that the masked man had a handgun, which Laraby described as being approximately six inches in length. Laraby testified that the two men then entered the store, the masked man put the gun in his waistband and came towards her demanding money. While Laraby was emptying the cash drawer, the masked robber grabbed the drawer from her hand and pulled out the money while the African-American robber grabbed money from her hand The two then exited the store. Laraby told another employee to call 911 and then exited the store herself. Outside of the store, Laraby saw a small red car in the middle of Ontario Street with the passenger's side door open and a white man getting into the car. Laraby described the man as older with blondish-gray collar-length hair. She then identified a photograph of appellant as looking like the man she saw standing outside of the red car. She further stated that in comparing the photograph to appellant in court, appellant's hair was shorter than it was in the photograph. She admitted, however, that she never saw the face of the man she saw getting into the red car and that she could not say with 100 percent certainty that appellant was the man she saw getting into the red car. She also stated that a photograph of appellant's red Ford Probe looked like the car she saw exiting the scene but that the license plate was different. Laraby testified that the robbers took approximately $900 from her that night.
 {¶ 10} On December 27, 2001, Dennis McVicker, Jr., was working at the Stop Go Carryout on Arlington in Toledo, Lucas County, Ohio. Sometime after 4:00 p.m., two men entered the store with pantyhose over their faces and proceeded to rob the store. McVicker stated that one of the robbers was African-American and that the second robber could have been Hispanic, white or a light skinned African-American. The light skinned man cornered a customer while the African-American approached McVicker who was standing behind the counter. As McVicker reached for his cell phone, the African-American robber said "He has a gun," referring to the light-skinned robber, although McVicker testified that he never actually saw a gun. The light-skinned robber then directed the African-American robber to get the money. The African-American man then removed the pantyhose from his head, reached into the register drawer and removed money. The robbers then exited the store and ran to a red Ford Probe that was approximately one block away. McVicker ran out of the store after the robbers and got part of the car's license plate number. McVicker described the African-American robber as shorter and heavier than the light-skinned robber and stated that the light-skinned man was clearly directing the robbery.
 {¶ 11} On December 27, 2001, between 4:30 and 5:00 p.m., Jessica Burkett drove to the Stop Go Carryout on Arlington to purchase cigarettes. As she approached the front door, she noticed two men who were standing by the front door pull masks over their faces and enter the store. She immediately feared that the store was being robbed and got back in her car to leave. As she was driving away, she saw the same two men run out of the carryout and toward a red Ford Probe. She then saw the two men climb into the Ford Probe and drive off. Because her car was running, Burkett followed the Probe and obtained a full license plate number from it. She then relayed that information to the police. The following day, police asked her to look at a red Ford Probe that was parked in a driveway at a home off of Glendale. Although Burkett positively identified the car as the one involved in the robbery, she noted that the license plate was different from the one on the car she saw leaving the scene of the Stop Go.
 {¶ 12} Randy Neubert was a customer of the Stop Go when it was robbed on December 27, 2001. Neubert testified that as he began to leave the Stop Go, two men entered the store with nylons covering their faces. Neubert stated that one man, whom he described as African-American, approached the counter and removed his mask while the other man, whom he described as white, directed the African-American man to get the money. Neubert also testified that the white man placed his hand on the handle of what appeared to be a gun tucked into his waistband and said "Don't make me do it." The African-American robber then took the money out of the cash register and the two men fled the store. Neubert stated that after the two men left, he ran out of the store and saw them get into a red Ford Probe. Neubert further stated, however, that a third person was driving the Probe because the white man got into the passenger's seat and the African-American man got into the back seat.
 {¶ 13} Kelly Boerst testified that on December 27, 2001, she was the owner of a red Ford Probe when she noticed that the rear license plate was missing. She stated that she first noticed it when she was home on her lunch hour but later that day she was notified that there were a number of police officers at her home. Because it had snowed and the car had not been moved in two days, however, it was clear that the car was not involved in the robbery but that its plate was simply missing.
 {¶ 14} Sergeant Greg Smith testified that on December 22, 2001, he responded to a call regarding the robbery of the Buckeye Carryout. Smith obtained descriptions of the suspects from the witnesses and initiated an investigation. Subsequently, he received information from Detective Daniel Navarre that two suspects had been apprehended in connection with the robbery of the Stop Go on December 27. Those suspects were George Hughes and Jerome Renzhofer. After his apprehension, Hughes' photograph was broadcast on a local news program. Smith testified that after that broadcast, he received a telephone call from Kelly Crockett, a witness to the Buckeye Carryout robbery, who stated that Hughes was the same man who robbed that carryout. After Smith advised Hughes of his constitutional rights, Hughes admitted that he had been involved in the Buckeye Carryout robbery. He further implicated Renzhofer and appellant, stating that
 {¶ 15} Renzhofer drove the car and that appellant had the gun. Based on this information, Renzhofer was subsequently arrested and corroborated Hughes' story.
 {¶ 16} At the trial below, George Hughes and Jerome Renzhofer also testified. Hughes stated that he has known appellant for approximately five months and that he started smoking crack cocaine with appellant several weeks before the robberies. With regard to the Buckeye Carryout robbery, Hughes testified that earlier in the day, appellant made the decision that he and Hughes would rob the store and that Renzhofer would drive appellant's red Ford Probe. Hughes also stated that appellant carried a gun. As they entered the carryout, appellant, who was wearing a large round mask, held the gun while Hughes, who was not masked, grabbed the money out of the cash register. They then exited the store and ran out to appellant's red Ford Probe. The threesome then drove into Michigan where appellant disposed of the mask and the license plate that had been on his car. Hughes testified that appellant then put his own license plate back on the car and they drove to appellant's home in Swanton. Hughes testified that he believed they got $400 from the Buckeye Carryout robbery, which they split three ways.
 {¶ 17} Hughes then testified regarding the December 27 robbery of the Stop Go. He stated that on that afternoon, he, Renzhofer and appellant were driving around when they realized that they were low on gas and had no money for gas or crack cocaine. They then passed the Stop Go, after which appellant indicated that that was the store they would rob. Earlier in the day, the trio had stolen women's nylon stockings from a Dollar Store and had removed the license plate from a red Ford Probe that they had found in a driveway in Maumee. They then pulled the car over near the Stop Go and appellant and Hughes exited the car while Renzhofer remained in the back seat. As appellant and Hughes approached the store on foot, they pulled the nylon stockings over their heads to cover their faces. They then entered the store with appellant carrying his gun. Hughes testified that appellant warned the customers not to move while Hughes grabbed the money out of the cash register. The men then exited the store and ran to appellant's red Ford Probe which appellant drove from the scene. The group then drove to Carol Menifee's house where they divided the money, which Hughes stated was approximately $150. Hughes testified that Menifee is a friend of theirs and that they frequently would go to her home to smoke crack cocaine. On cross-examination, Hughes admitted that he was testifying in exchange for a reduction in the charges brought against him. He further denied ever telling a Dennis Duhart or a Lee Fox, while he was in jail pending trial on the robbery charges, that the police had the wrong man and that appellant was not involved in the robberies.
 {¶ 18} Jerome Renzhofer's testimony was similar to that of Hughes regarding the circumstances surrounding the robberies. Renzhofer stated that he had known Hughes for approximately one year, that he sold crack cocaine to Hughes and that he frequently smoked crack cocaine with Hughes and appellant. Renzhofer further stated that both of the robberies were appellant's idea, that they put stolen license plates on the rear of appellant's red Ford Probe prior to both robberies and that he, Renzhofer, stayed in appellant's Ford Probe during both robberies. Although Renzhofer drove the car away from the scene after the Buckeye Carryout robbery, he stayed in the back seat during the Stop Go robbery, after which appellant drove the car from the scene. He also admitted that after the Stop Go robbery, when the trio had returned to Menifee's house, he removed the stolen license plate from appellant's car and threw it away. On cross-examination, Renzhofer admitted that in exchange for his testimony, he would plead guilty to a third degree felony. Upon further questioning by both appellant's counsel and the prosecutor, however, Renzhofer made several statements indicating that appellant had threatened his family. Although appellant's counsel did object to two of these statements, the court never expressly ruled on those objections and appellant's counsel continued with her questioning.
 {¶ 19} Carol Menifee also testified at the trial below. Menifee stated that in the months prior to December 2001, appellant, Hughes and Renzhofer were friends of her boyfriend Tom and that the three frequently came to her home on Laurel Street to drink and smoke crack cocaine. She then testified as to her memory of the events of the day before appellant was arrested at her home. Menifee stated that appellant, Hughes and Renzhofer were all at her house that afternoon, that they left, and that they returned in the evening. She further stated that appellant left his car in her driveway that night because he was drunk and that he had backed it in so the front of the car faced the street. The following day, Detective Daniel Navarre came to her door and questioned her about the red Ford Probe parked in her driveway. After Detective Navarre had been there a short time, appellant returned for his car and was arrested.
 {¶ 20} Detective Daniel Navarre testified regarding his investigation of the Stop Go robbery. Based on information he had received from a Crime Stopper telephone call, Navarre investigated a red Ford Probe parked in a driveway on Laurel Street. While talking to Carol Menifee, Navarre learned that the car belonged to appellant. Shortly thereafter, and while Navarre was still at Menifee's house, appellant arrived to pick up his car. He was then taken into custody. While Navarre was interviewing appellant, another Crime Stopper call came in which identified the location of the two other suspects in the robberies, Hughes and Renzhofer. Those two suspects were arrested and brought in for questioning. Navarre testified that upon his arrest, appellant had the keys to the red Ford Probe. Upon searching the car, Navarre found a bag from the Family Dollar Store, a new pair of women's nylon stockings that had been cut, a pair of scissors and a pair of gloves. Navarre also testified regarding his interview of appellant. That interview was recorded by videotape and was played for the jury. Afterward, Navarre pointed out that although he only questioned appellant as to one robbery, appellant referred to "robberies" several times. In the interview, appellant is heard to make several inconsistent statements regarding his whereabouts on December 27, 2001, the day before the interview. He also asserts that Steve Smith a/k/a Hawkins, his wife's brother, was the third robber and that Steve was setting him up. After appellant, Hughes and Renzhofer were arrested on December 28, 2001, Navarre spoke with Sergeant Smith and connected the two robberies. Thereafter, all three suspects were charged with both robberies.
 {¶ 21} In his defense at the trial below, appellant attempted to establish an alibi for his whereabouts on December 22 and 27, 2001. To that end, he called George Evans, an acquaintance of appellant, Theresa Adkins, appellant's wife, Denise Jiminez, an acquaintance of appellant, Debbie Hawkins, appellant's sister, Rick Frederick, Debbie Hawkins' fiancé, and Wesley Fox, an acquaintance of George Hughes. With regard to December 22, George Evans testified that he saw appellant at Steve Hawkins' house between 4:45 and 5:00 p.m. Hawkins is Theresa Adkins' brother. Evans stated that when he arrived, appellant and Hawkins were drinking beer in the backyard. Evans stayed at Hawkins' home for a couple of hours drinking along with appellant and Hawkins. Evans testified that during that time, at approximately 6:00 p.m., George Hughes and Jerome Renzhofer showed up, had a conversation with appellant and then left after appellant gave them the key to his car. Thereafter, around 7:00 p.m., appellant's wife Theresa arrived. Theresa confirmed this arrival time. She also testified that she remembered the day because she and her brother always go out on the Saturday before Christmas. Evans, Hawkins, Theresa and appellant then went to The Distillery for dinner. The group stayed there until approximately 9:00 p.m., after which they went to Jerry Ben's, a bar. Theresa testified that she was the designated driver for the evening and that she only drank one beer. The others, however, did drink throughout the evening. The group stayed at Jerry Ben's until it closed, after which they dropped Evans off at his house. Appellant and Theresa then spent the night at Hawkins' house.
 {¶ 22} Regarding the events of December 27, 2001, Theresa testified that she remembered the date because that was the day that she returned Christmas presents. She stated that appellant called her from Carol Menifee's house at around 5:30 p.m. and asked her to pick him up because his car needed brake fluid and he had had too much to drink. Theresa then picked up appellant at approximately 6:15 p.m. and took him home. Rick Frederick, appellant's sister Debbie Hawkins' fiancé, testified that on December 27, 2001, he went to Steve Hawkins' house to pick up his post hole diggers and saw appellant there. He stated that he arrived at approximately 4:45 p.m. and left at around 5:30 p.m. and that appellant was there the entire time.
 {¶ 23} Appellant also attempted to establish that George Hughes had a key to appellant's car by introducing the testimony of Denise Jimenez and Debbie Hawkins, who found a key in Hughes' belongings that appeared to be a key to appellant's car. Finally, appellant introduced the testimony of Wesley Fox who met George Hughes in the Lucas County Jail when the men were both incarcerated there. Fox testified that while the two were in jail, Hughes told him that the police had the wrong guy, referring to appellant.
 {¶ 24} At the conclusion of the evidence, appellant proffered the testimony of Dennis Duhart. Appellant asserted that had he been present, Duhart would testify that he was incarcerated in the Lucas County Jail along with George Hughes, that he and Hughes had been friends when they were younger and had become reacquainted while in jail, that he had conversations with Hughes, that in those conversations Hughes admitted that Adkins was not involved in the robbery, and that Hughes admitted that he was testifying against appellant to obtain a plea bargain. Appellant also proffered that Duhart would have testified that he was not receiving anything in exchange for his testimony.
 {¶ 25} After deliberating, the jury returned guilty verdicts on both aggravated robbery charges and determined that appellant had a firearm on or about his person or under his control while committing the offenses. On May 29, 2002, the trial court entered a judgment entry of conviction and sentence. As to the first count of aggravated robbery, the court sentenced appellant to serve seven years incarceration, with an additional three years on the firearm specification. As to the second count of aggravated robbery, the court also sentenced appellant to serve seven years incarceration with an additional three years on the firearm specification. The court then ordered that the seven year terms be served consecutively and that the three year terms on the firearm specifications be served concurrently, for a total of 17 years. It is from that judgment that appellant now appeals.
 {¶ 26} In his first assignment of error, appellant challenges the trial court's failure to rule on objections to the testimony of state's witness Jerome Renzhofer. Appellant points to four instances in which Renzhofer testified that appellant had threatened his family. The first instance occurred during appellant's cross-examination of Renzhofer when counsel was questioning Renzhofer as to his motives for testifying against appellant:
 {¶ 27} "Q Okay. You're indicted with both robberies?
 {¶ 28} "A (Witness nods head)
 {¶ 29} "Q Saving yourself a lot of time?
 {¶ 30} "A Causing my family a lot of grief. My family's been threatened. I've been threatened.
 {¶ 31} "Q Hey, I did not ask that.
 {¶ 32} "A Well, then don't go into that on me."
 {¶ 33} Subsequently, on redirect examination, Renzhofer made the following statements in response to questioning by the prosecutor:
 {¶ 34} "Q In fact, the fact you had kids didn't stop you from smoking crack, did it?
 {¶ 35} "A (Witness shakes head)
 {¶ 36} "Q Because you were addicted, right?
 {¶ 37} "A (Witness nods head)
 {¶ 38} "Q You're going to have to answer yes or no. I know its hard.
 {¶ 39} "A Yes.
 {¶ 40} "Q And you love your kids, don't you?
 {¶ 41} "A That's why I'm sitting here. If it wasn't for my family and my kids Dave would walk. When he threatened my family, he brought me in it. I told the man when I met him, `You don't come after me, you don't come after my family.'
 {¶ 42} "MS. SHARKEY: Objection
 {¶ 43} "A I never tried to hurt you. When he did that, I sit here.
 {¶ 44} "THE COURT: Hold on. Go ahead and ask a question.
 {¶ 45} "* * *
 {¶ 46} "Q Now, Miss Sharkey talked to you about the agreement you had with the State. Does that agreement require truthful testimony?
 {¶ 47} "A No. you told me to make sure I told the truth, don't lie. That's all you asked of me and that's all I've did. I'm not going to lie no matter what. I've been to prison before. I don't never tell on anybody unless they threaten me in a certain way. The man wouldn't be sitting here if it wasn't for him.
 {¶ 48} "MS. SHARKEY: Objection.
 {¶ 49} "THE COURT: Let's go on.
 {¶ 50} "* * *
 {¶ 51} "Q And you agreed to come in and testify against the person who got you involved in this mess?
 {¶ 52} "MS. SHARKEY: Objection.
 {¶ 53} "Q Correct?
 {¶ 54} "A That's correct.
 {¶ 55} "THE COURT: Overruled.
 {¶ 56} "A Believe it. That's not the only reason. You won't let me say, but that's not it.
 {¶ 57} "THE COURT: Let's not get into that."
 {¶ 58} Appellant asserts that Renzhofer's statements regarding threats that appellant allegedly made against his family were improper and that the trial court's failure to rule on appellant's objections and failure to strike the statements amounted to prejudicial error. The state counters that the statements were first invited by defense counsel after which counsel failed to object. The state therefore contends that appellant has waived any error in the admission of these statements.
 {¶ 59} We first note that none of the questions posed to Renzhofer were objectionable. Rather, Renzhofer's improper and non-responsive answers introduced the objectionable testimony into the record. This evidence was objectionable as evidence of other crimes, wrongs or acts. Evid.R. 404(B). Nevertheless, appellant's trial counsel never moved to strike the responses from the record. Evid.R. 103(A) provides that error may not be predicated upon a ruling which admits evidence unless a substantial right of a party is affected and a "timely objection or motion to strike appears of record stating the specific ground of objection, if the specific ground was not apparent from the context." Where the answer but not the question is objectionable, a party challenging the admission of that evidence must move to strike that response from the record. Absent such a motion, the issue has not been preserved for review and the matter is waived. Johnson v. English (1966),5 Ohio App.2d 109, 113-114; Jackson v. Kroeger (Feb. 6, 1986), Cuyahoga App. No. 49989. Accordingly, the first assignment of error is not well-taken.
 {¶ 60} In his second assignment of error, appellant asserts that the trial court erred in denying his motion for a continuance. Appellant sought the continuance in an attempt to secure the appearance of Dennis Duhart who, at the time of the trial below, was incarcerated in Mississippi.
 {¶ 61} The grant or denial of a motion for a continuance lies within the sound discretion of the trial court. State v. Unger (1981),67 Ohio St.2d 65, 67. An appellate court will not reverse the denial of a continuance unless there has been an abuse of discretion. Id. In evaluating the merits of a motion for a continuance: "a court should note, inter alia: the length of the delay requested; whether other continuances have been requested and received; the inconvenience to litigants, witnesses, opposing counsel and the court; whether the requested delay is for legitimate reasons or whether it is dilatory, purposeful, or contrived; whether the defendant contributed to the circumstance which gives rise to the request for a continuance; and other relevant factors, depending on the unique facts of each case." Id. at 67-68.
 {¶ 62} Under the circumstances of this case, we cannot find that the trial court abused its discretion in denying appellant's motion for a continuance. The testimony which appellant sought to present through Dennis Duhart was cumulative in that Wesley Fox also testified that, while in the Lucas County Jail, Hughes told him appellant did not commit the robberies. Furthermore, as the trial court pointed out in denying the motion, neither party nor the court knew when Duhart would be able to return to Ohio to testify. Where a trial is about to begin and the length of the requested delay is unknown, we cannot say that a trial court abuses its discretion in denying a motion for a continuance. The second assignment of error is therefore not well-taken.
 {¶ 63} In his third and final assignment of error, appellant asserts that the trial court erred in ordering that he serve consecutive sentences. More specifically, appellant contends that the court failed to make the statutorily required findings to support the consecutive nature of the sentences.
 {¶ 64} The Supreme Court of Ohio recently held that R.C.2929.14(E)(4) requires a trial court to make its statutorily enumerated findings regarding consecutive sentences and state its reasons for those findings at the sentencing hearing. State v. Comer, 99 Ohio St.3d 463,2003-Ohio-4165. The trial court must first consider the factors set forth in R.C. 2929.12(B) and (C) to determine how to accomplish the overriding purposes of felony sentencing embraced in R.C. 2929.11, Comer, supra at ¶ 13, and may not impose consecutive sentences for multiple offenses unless it finds the existence of three factors set forth in R.C.2929.14(E)(4). Id. Pursuant to that statute, the trial court must find that consecutive sentences are necessary to protect the public from future crime or to punish the offender. The trial court must next find that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public. Finally, the trial court must find the existence of one of the following enumerated circumstances:
 {¶ 65} "(a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.
 {¶ 66} "(b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.
 {¶ 67} "(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender." R.C. 2929.14(E)(4).
 {¶ 68} At the sentencing hearing below, the trial court ascertained that appellant had served a prior prison sentence for a felony offense in Ohio and that he was at the time of the hearing on supervised release after a conviction for a separate federal felony offense. The court then addressed appellant as follows:
 {¶ 69} "Regarding the underlying charges, Mr. Adkins, the Court has done a weighing test required under the statute 2929.12, the sentencing statute. I've noted your prior record, your prior felony record, that you have a history of criminal convictions; also, obviously you've not responded to sanctions in the past; these are very serious offenses, all of which makes recidivism more likely. They are more serious offenses because of the nature of the offense and because a handgun was employed putting people in danger, all of which tells the Court that the presumption [for a prison term] will remain in place.
 {¶ 70} "The handgun specifications are mandatory actual incarcerations. You cannot be considered for community control on those. And the Court has also considered the minimum sentence in this case, and because of your prior record and the nature of this offense the Court finds that that would demean the seriousness of the offense, not adequately protect the community.
 {¶ 71} "The Court has also considered concurrent sentences and makes the same findings, that because of that, and also because these were two separate robberies, you put two separate class — sets of people in danger, that concurrent sentences would not be warranted but consecutive would be."
 {¶ 72} Upon a review of the trial court's statements, we must conclude that the trial court's findings do not comply with the sentencing statute. In particular, the court never found that consecutive sentences were not disproportionate to the seriousness of appellant's conduct and to the danger appellant poses to the public. This court has consistently held that the imposition of consecutive sentences requires such an express finding. State v. Stuart, 6th Dist. Nos. OT-01-025 
OT-01-029, 2002-Ohio-3427; State v. Claussen, 6th Dist. No. OT-01-026, 2002-Ohio-2358; State v. Walk (Dec. 29, 2000), Erie App. No. E-97-079.
 {¶ 73} Accordingly, we must find that the trial court erred in imposing consecutive sentences on appellant and the third assignment of error is well-taken.
 {¶ 74} On consideration whereof, the court finds that the Lucas County Court of Common Pleas erred in sentencing appellant. Those sentences are hereby vacated and the case is remanded to the trial court for resentencing in compliance with State v. Comer. The trial court's judgment is affirmed in all other respects. The parties are ordered to pay their own court costs of this appeal.
Sentences Vacated; Judgment Affirmed in all other Respects.
Richard W. Knepper, J., Mark L. Pietrykowski, J. concur.
Judith Ann Lanzinger, J., concurs and writes separately.